IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

ANTHONY IVAN HAIRSTON,                    )
                                          )
                    Plaintiff,            )        Case No. 7:19-cv-00328
                                          )
v.                                        )        **MEMORANDUM OPINION**
                                          )
SHERIFF TIM ALLEN, *et al.*,              )        By:   Hon. Thomas T. Cullen
                                          )              United States District Judge
                    Defendants.           )

_____

Anthony Ivan Hairston ("Hairston"), a former inmate at the Roanoke City Jail (the

"Jail"), filed this 42 U.S.C. § 1983 action against 22[1] Defendants—consisting of medical[2] and

non-medical[3] personnel at the Jail—alleging that they violated his Eighth and Fourteenth

---

[1] On January 17, 2020, Hairston voluntarily dismissed from the case defendants (1) Chief Deputy David K. Bell, (2) Sergeant Thomas Boone, and (3) Lieutenant Scott Fannin pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) (*see* ECF No. 43), reducing the number of defendants to 19.

[2] The "Medical Defendants" are: (1) Wellpath LLC, f/k/a Correct Care Solutions, LLC, (2) Correct Care Solutions, LLC, (3) Amy Hovis, PA-C, (4) Karl Kletzing, M.D., (5) Racheal Boon, CMA, (6) Victoria Burdette, CMA, (7) Deanna Bernard, CMA, (8) Ligia Trigo, CMA, (9) Shanita Byers, CMA, and (10) Bridget Randolph, CMA. (At the September 8, 2022 hearing on this motion, Hairston's counsel conceded that Dr. Kletzing should be released from the case as an individual defendant, so he will be dismissed from this case.)

The following medical-type defendants have not appeared in the case and are not parties to the present motion for summary judgment: (1) Jane/John Does, M.D.: *CCS's Licensed Physician and Medical Director at Roanoke City Jail from April 24, 2017 to May 24, 2017*, (2) Jane/John Does: *Medical Administration Personnel and Sick Call Triage Nurses on duty at Roanoke City Jail from April 24, 2017 to May 24, 2017*, and (3) Justin Pham, M.D. Dr. Pham was served via the Secretary of Commonwealth on July 30, 2019. (*See* ECF No. 7.) Since its filing in 2019, Hairston has not sought to amend his complaint to name any John/Jane Doe defendants.

[3] The "Deputy Defendants" are (1) Master Deputy (Retired) William Belanger, (2) Master Deputy (now Sergeant) James Murphy, (3) Sergeant (now Lieutenant) John Earls, and (4) Lieutenant (now Major) Monica Perkins. Together with Sheriff Allen, these security staff defendants are referred to collectively as the "Sheriff Defendants."

Sheriff Allen is no longer Sheriff, and the current Sheriff—Antonio Hash—has appeared as an Intervenor. (*See* ECF No. 91.)

Amendment rights by denying him medical care for a ruptured Achilles tendon. Hairston has also asserted state law claims against the Medical Defendants for negligence and breach of contract. The Medical Defendants and the Sheriff Defendants have moved for summary judgment on each of Hairston's claims against them.

After reviewing the pleadings, motions, and the voluminous factual record, the court will grant the Sheriff Defendants' motion in its entirety, and grant in part and deny in part the Medical Defendants' motion. Specifically, the court will grant summary judgment as to all claims against the Medical Defendants *except* Count V as it relates to PA Hovis.

## I.   BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Hairston. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiff Anthony Hairston is a Virginia resident who, from September 2016 to September 2017, was incarcerated at the Jail. During that time, the Deputy Defendants were all employed by the Sheriff, and their primary responsibility was to oversee the Jail's day-to-day operations. During the same period, the Medical Defendants were all employed by Correct Care Solutions, LLC ("CCS"), the company with whom the Jail contracted to provide medical services to inmates.[4]

---

The following deputy-type defendant has not appeared in the case nor moved for summary judgment in the instant motion: Sheriff Defendant Jane/John Doe Deputies: *Officers on duty at the Roanoke City Jail from April 24, 2017 to May 24, 2017.*

[4] Under the contract between CCS and the Jail, CCS, as an independent contractor, was to "provide or arrange for" inmate medical services. (Contract at Ex. 2 (Scope of Services) ¶ 2; Contract § 13 [ECF No. 133-2].) This includes providing sick call triage at the Jail at least once every 24 hours and staffing the Jail's medical clinic ("Medical") every weekday. (*See* Contract, Ex. 2 ¶ 3(d).) CCS was required to "provide medical personnel on-site 24/7 to manage urgent and emergent issues arising at the Jail." (*Id.* ¶ 5.) CCS was responsible to arrange for physician specialty services when its authorized physician deemed it medically necessary, whether those

In September 2016, Hairston began serving his sentence at the Jail. (Anthony Hairston Dep. 15:5–13, March 10, 2022 [attached to this Opinion as Appendix A]; Capt. Brandon Young Decl. ¶ 2, [ECF No. 81-10].) Early in the morning on April 24, 2017, while climbing down the ladder to get out of bed, Hairston struck his right foot on a metal bar. (Hairston Dep. 31:13–32:11, 73:20–74:19.) He heard his ankle "pop" and, when he put his leg down, he "collapsed to the floor." (*Id.* 32:6–11.) Hairston had to limp out of his cell. (*Id.* 32:17–18.) As it turns out, Hairston had ruptured his Achilles tendon.[5]

When an inmate at the Jail suffers an injury, he may request to be seen by a CCS medical "Provider"[6] in the Jail's medical clinic ("Medical") by submitting a Medical Request Form.[7] Although Hairston testified that he notified a deputy within an hour of sustaining his injury, he does not recall which deputy it was, and he admits that he did not ask a deputy for a Medical Request Form at that time. (Hairston Dep. 32:12–33:14.)

---

specialty services were performed on- or off-site. (*Id.* ¶ 12.) CCS was also responsible for prescribing and dispensing all medications for inmates. (*Id.* ¶ 14.)

[5] Hairston was not diagnosed with a ruptured Achilles tendon until May 24, exactly one month later.

[6] The three types of "Providers" at the Jail were physicians, physician assistants ("PAs"), and nurse practitioners. (Amy Hovis Dep. 70:3–70:11, March 22, 2022 [Attached to this opinion at Appendix B].)

[7] The nursing staff triaged inmates based on the Medical Request Forms that inmates submitted, determined which inmates they would place on Medical's sick-call list, and then either a nurse or a Provider would see the inmate patients on the list during sick call. (Hovis Dep. 25:12–26:25; Daphne Norman Dep. 85:22–86:21, March 31, 2022 [Attached to this Opinion at Appendix C].) An average day's sick call consisted of about 20–25 inmate patients. (Hovis Dep. 26:20–25.) Inmates were not permitted to visit Medical by themselves; a deputy had to escort them there once Medical called for them. (Deputy William Belanger Dep. 61:8–15, March 29, 2022 [Attached to this Opinion at Appendix D].) Only medical staff decided which inmates they would see; deputies did not make those decisions. (Lt. Monica Perkins Dep. 59:9–60:3, March 18, 2022 [ECF No. 133-43].)

Various parties refer to these Medical Request Forms by several different names in the record. For uniformity, they are referred to throughout this Memorandum Opinion as Medical Request Forms. (*See* Inmate Handbook at 14 [ECF 133-48].)

Hairston testified that he complained to both medical staff and deputies "every day, all day" for about three weeks. (*See id.* 47:18–20, 77:3–11 ("I told nurses every day . . . The deputies, I told them all day. I told them at night-time, 8 o'clock at night, 9 o'clock at night. I'm like, could you please get me in [to medical] tomorrow. They got to take me to a doctor. They got to take me to a hospital.").) Hairston says he complained to "each and every nurse . . . [a]ll of them, every last one of them, every day," but does not recall whether it was in April or May. (*Id.* 98:8–20.) Although Hairston does not recall the specific date or dates, he claims that he complained to Deputies Belanger[8] and Murphy[9] about his ankle, and that both of them told him that they had let medical know about it and that medical should be calling him. (*Id.* 112:2–113:16.) At various times between April 24 and May 24, Hairston claims he told "all officers" that he had an emergency, his leg was swollen, and that he needed to see a doctor;

---

[8] Between April 24, 2017 and May 24, 2017, Deputy Belanger was on duty the following dates and times:

| | |
|---|---|
| April 26, 2017 | 6:30 a.m. – unclear |
| April 27, 2017 | 6:25 a.m. – 6:30 p.m. |
| May 15, 2017 | 6:25 a.m. – 6:30 p.m. |
| May 16, 2017 | 6:24 a.m. – 6:30 p.m. |
| May 24, 2017 | 6:23 a.m. – 6:30 p.m. |

(*See* Pl.'s Br. in Opp. to Sheriff Defs.' Summ. J. Mot. Statement of Facts ¶ 11 [ECF No. 138]; Sheriff Defs.' Br. in Supp. Summ. J. Mot. ¶ 67 [ECF No. 133].) Belanger admits that Hairston told him about his ankle. (Belanger Dep. 55:2–6.)

[9] Between April 24, 2017 and May 24, 2017, Deputy Murphy was on duty the following dates and times:

| | |
|---|---|
| May 5–6, 2017 | 6:30 p.m. – 6:30 a.m. |
| May 16, 2017 | 6:24 a.m. – 6:30 p.m. |
| May 19, 2017 | 6:30 a.m. – 6:30 p.m. |
| May 24, 2017 | 6:30 a.m. – 6:20 p.m. |

(*See* Sheriff Defs.' Br. in Supp. of Summ. J. Mot. Statement of Facts ¶ 68; Pl.'s Br. in Opp. to Sheriff Defs.' Summ. J. Mot. Counterstatement of Mat. Facts ¶ 68.)

he also claims that he showed them his swollen ankle.[10] Clarence Boyd, who was incarcerated at the Jail with Hairston from February 2017 to July 2017, says he saw Hairston limping and recognized that he was "clearly in pain as he walked[.]" (Clarence Boyd Decl. ¶ 4, Aug. 17, 2022 [ECF No. 139-7].) Boyd testified that it was clear to him that Hairston "had an injury to his right leg and required medical assistance." (*Id.*) Boyd also claims that he observed Hairston, from the end of April until he was moved from his pod in May, "constantly at the window of his pod trying to get the attention of deputies or medication aides that walked by. Any time a deputy or a medication aide was at the window or door of Mr. Hairston's pod, [Boyd] saw him speaking with them and trying to show them his injured leg." (*Id.* ¶ 5.)

Several times per day, a CCS Certified Medication Aide ("CMA") made rounds distributing medications to inmates in the Jail's housing units, including to Hairston when he was on the list to receive medication.[11] (*See, e.g.*, Hairston Dep. at 125:3–126:17; Burdette Dep. 13:21–24.) During their medication rounds, CMAs were always accompanied by at least one Deputy—usually two—for their safety. (James Murphy Dep. 50:11–14, March 25, 2022 [attached to this Opinion at Appendix F]; Byers Dep. 23:7–24:16.) Hairston claims that, on the day of his injury, he told the CMA who came to administer his medication[12] about his

---

[10] The Deputy Defendants' medical training was limited to CPR and First Aid training; they were security personnel, not medical personnel. (*See, e.g.*, Perkins Dep. 65:21–66:20.)

[11] The CMAs are not trained to diagnose medical conditions and were not permitted to conduct physical assessments of inmates. (Bridget Randolph Dep. 54:5–10, March 30, 2021 [attached to this Opinion at Appendix E]; Victoria Burdette Dep. 30:18–23, March 22, 2022 [ECF Nos. 81-7, 133-37, 139-5].) They simply loaded their medication cart with the inmates' prescriptions, went to the inmate housing pods with their carts, and passed out the medications. (Deanna Bernard Dep. 45:23–48:8, March 30, 2022 [ECF Nos. 81-6, 133-40, 139-3]; Shanita Byers Dep. 32:18–24, March 31, 2022 [ECF Nos. 81-3, 133-36, 139-2].)

[12] Hairston was receiving daily medication for issues unrelated to this lawsuit.

injury, but he did not ask the CMA for a Medical Request Form and does not remember which CMA it was. (Hairston Dep. 33:1–14.) Hairston alleged that he "showed his leg to Defendant [CMA] Bernard,[13] and told her something's wrong, something popped. It's flapping, it's swollen, and it's serious. I need to see the doctor immediately." (Hairston Dep. 74:12–19.) Hairston admits, however, that he has no specific recollection of having interacted with CMA Bernard on April 24. (Hairston Dep. 74:10–79:12.)

CMAs also kept Medical Request Forms on their medication carts. The CMAs would provide forms to inmates upon request and then deliver the completed forms to the CCS nursing staff to schedule sick calls and other medical services. (Inmate Handbook at 14; Hairston Dep. 36:2–17;[14] Burdette Dep. 17:2–25; John Earls Dep. 43:13–44:7, March 18, 2022 [ECF No. 133-41].) Generally, when the CMAs submitted a collected Medical Request Form to the nurse, the nurse would respond to it, give it back to the CMA, and the CMA would return it to the inmate at the next medication pass. (Byers Dep. 28:16–29:10.) Other than (1) being placed on Medical's sick call list and being seen in person or (2) having a medical emergency requiring immediate intervention to save life or limb, the Medical Request Form procedure was the only way for inmates to communicate with Medical. Given their lack of medical training and experience, CMAs did not have the ability to place an inmate on the sick call list; the nurses handled that. (Burdette Dep. 17:15–25.) There was no limit to the number

---

[13] Jail records reflect that CMA Bernard distributed Hairston's medication at 8:00 a.m. on April 24 and that this was the only time Hairston received medication that day. (*See* Medication Delivery Chart, May 4, 2017 [ECF No. 139-6].)

[14] Hairston describes being able to hand in a Medical Request Form "to a nurse," but he elsewhere refers to the CMAs as nurses. (Hairston Dep. 32:20–21) (". . . when the nurse came around for the medication part, which is normally around 8:00[.]").)

of Medical Request Forms that an inmate could submit. (Hairston Dep. 50:25–51:17; Inmate Handbook at 14, 56, 58.) Whenever Hairston submitted a Medical Request Form, Medical's response "generally c[ame] a day later." (Hairston Dep. 158:3–8.)

Although fellow inmate Clarence Boyd claims that he witnessed Hairston, after his injury occurred, hand in what Boyd recognized as a Medical Request Form "to the medication aide nearly every day" (Boyd Decl. ¶ 6), the only Medical Request Forms in the record[15] are dated by Medical April 29 and May 15, 2017. Hairston's April 29 Medical Request Form[16] reads, "I fell off the top bunk and injured my leg very badly and I need to have x-rays taken to check my leg for broken bones (it is very swollen)." (April 29 Medical Request Form [ECF No. 133-10]; Hairston Dep. 34:3–35:13.) Medical responded by return Medical Request Form note to Hairston that he was "To Be Seen." (*Id.*)

As a result of Hairston's April 29 Medical Request Form, RN Heather Glen created a digital Task in Hairston's Electronic Medical Record ("EMR") that same day indicating that Hairston had "leg pain after falling out of bunk. States leg is swollen and painful[.]"[17] On April 30, LPN Tracy Stroupe[18] saw Hairston in Medical. (Hairston Admis. 9 to Med. Defs.' Req.

---

[15] Hairston testified that he submitted Medical Request Forms about his ankle that were not returned to him and not responded to by the Medical Defendants. (Hairston Dep. 42:3–19, 50:19–53:16.) But Hairston does not remember when or to whom he submitted the unresponded-to Medical Request Forms during this time period, and he was always given Medical Request Forms when he asked for them. (Hairston Dep. 35:14–38:22.)

[16] On April 27 or 28, 2017, Hairston filled out and submitted this undated Medical Request Form to see a Provider for his injury. (Hairston Dep. 34:3–35:13; Hairston Adm. 1 to Sheriff Defs. R/A [ECF No. 133-4]; April 29 Medical Request Form [ECF No. 133-10].)

[17] LPN Stroupe's Chart Note indicated that Hairston was limping, in addition to these symptoms. (Chart Note at 12:06 a.m., April 30, 2017 [ECF 133-15].) LPN Daphne Norman explained that the Task List is like the Chart Notes but "says: This is what I need. And then a response, like 'completed' or 'refused'—or whatever the outcome was." (Norman Dep. 43:1–4.)

[18] LPN Stroupe is not a defendant in this case.

For Admis. [ECF No. 133-6].) The following two graphics depict two distinct and relevant series of entries in Hairston's EMR—the "Chart Notes" and the "Task List"[19]:

| Type: Misc. Note Access: Medical Staff | Date: 05/19/2017 13:35  Author: CMA Burdette, Victoria | Related Problems |
|---|---|---|
| | received boot | |
| Type: Medical Note Access: Medical Staff | Date: 05/16/2017 22:49  Author: LPN Browley LPN, Delilah | Related Problems |
| | Approved for restrictive housing. Moved from 1C to 2S06. | |
| Type: Misc. Note Access: Medical Staff | Date: 05/04/2017 10:53  Author: RN Norman, Daphne | Related Problems |
| | IBU mentioned in nurses note on 4/30/2017 was not entered. IM continues to complain of some pain and swelling. X ray was WNL. IBU 600 mg TID PRN X 4 days. | |
| Type: Misc. Note Access: Medical Staff | Date: 05/01/2017 14:59  Author: PA-C Hovis PA-C, Amy | Related Problems |
| | X-ray R ankle: WNL | |
| Type: Medical Note Access: Medical Staff | Date: 04/30/2017 00:06  Author: LPN Stroupe, Tracy | Related Problems |
| | IM presents to clinic with a limp. He reports falling out of bed 5 nights ago hurting his ankle. Right ankle swollen and bruised. IM refused offer of brace or ace bandage. He would like xray of area.  Will order Motrin 600mg and place on doctor sick call list. | |

(Chart Notes [ECF No. 133-15].)

| | | | |
|---|---|---|---|
| 1  05-01-2017 | X-ray At staff request x-ray R ankle  injury/fell out of bed  [Created by: PA-C Hovis PA-C, Amy at 05-01-2017 08:33:52] [Completed by: Binkley, Judy at 05-01-2017 10:17:01] | **Update Notes**  • **Completed Appointment** – x-ray scheduled 5/1/17 [Binkley, Judy on 05-01-2017] | |
| 1  05-01-2017 | Doctor At staff request right ankle swollen. IM request xray.  [Created by: LPN Stroupe, Tracy at 04-30-2017 00:07:32] [Completed by: Hovis PA-C PA-C, Amy at 05-01-2017 08:33:30] | **Update Notes**  • **Completed Appointment** – reviewed nurses note, X-ray ordered [PA-C Hovis PA-C, Amy on 05-01-2017] | |
| 1  04-29-2017 | Evening Sick Call At staff request c/o leg pain after falling off bunk. states leg is swollen and painful  [Created by: RN Glenn, Heather at 04-29-2017 04:35:04] [Completed by: Bean-Sandidge RN, Jessica at 05-01-2017 08:57:56] | **Update Notes**  • **Completed Appointment** – see chart notes [RN Bean-Sandidge, Jessica on 05-01-2017] | |

(Task List [ECF No. 113-7].)

---

[19] Within an inmate patient's EMR, there were multiple tabs under which Providers and nurses could document things about an inmate patient. Tasks were one; Chart Notes were another. It is unclear whether these separate tabs could be viewed by a Provider in an integrated way.

LPN Stroupe's April 30 Chart Note indicates that Hairston appeared "with a limp. He reports falling out of bed 5 nights ago[,] hurting his ankle. Right ankle swollen and bruised. [Inmate] refused offer of brace or ACE bandage. He would like x-ray of area. Will order Motrin 600 mg and place on doctor sick call list."[20] (Chart Note at 12:06 a.m., April 30, 2017.) Hairston does not recall refusing the offer of a brace or ACE bandage. (Hairston Dep. 40:13–17.)

LPN Stroupe also ordered an x-ray of Hairston's ankle under PA Hovis's name. (LPN Tracy Stroupe Decl., May 27, 2022 [ECF No. 139-12]; Hovis Dep. 60:16–21; 75:7–17.) Nurses routinely ordered x-rays for inmates when they were concerned that the inmate might have a fracture so the Provider could have the image results before or when they physically examined the patient. (Norman Dep. 74:20–77:3; *see also* Stroupe Decl.) LPN Stroupe placed Hairston on the doctor sick call list at 7:30 a.m. on April 30, 2017. (Task List at 7:32 a.m., May 1, 2017; Stroupe Decl.)[21] When Stroupe placed Hairston on the sick call list, she "anticipated he would

---

[20] Being on the "doctor sick call list" meant that the inmate would see a Provider, not necessarily a physician. (Hovis Dep. 69:25–70:11.)

[21] On August 22, 2022, Hairston filed a supplemental exhibit—Exhibit 28—to his timely filed opposition to the defendants' summary judgment motions. (*See* ECF Nos. 140 & 141.) Exhibit 28 is a Declaration of Michele Gonsman, RN, who claims to be a registered nurse with expertise in Clinical Forensic Documentation Analysis, including review of EMRs. (*See* Decl. of Michele Gonsman, R.N. ¶ 1, Aug. 21, 2022 [ECF No. 141-1].) At bottom, RN Gonsman performed a remote data inspection of the Jail's "CorEMR" system and declares that the Jail has failed to produce any Staff Activity Reports. (*Id.* ¶¶ 3–8). RN Gonsman declares that the Staff Activity Reports would contain eight relevant fields of additional and detailed information, and that there is also no record of any communication between the CMAs or Sheriff Deputies and the medical department requesting medical attention for Hairston's injury. (*Id.* ¶¶ 9–10.) At the September 8, 2022 hearing on this motion, Hairston, by his counsel Mr. Williams, referenced "missing" discovery, including Task Lists and other parts of Hairston's EMR from the Jail, implicitly if not expressly referencing this Gonsman Declaration. But no potential spoliation issue is before the court, by motion seeking an adverse inference or otherwise. Specifically, despite going all the way through discovery, Hairston has failed to raise this issue before the hearing on the defendants' respective motions for summary judgment.

Federal Rule of Civil Procedure 56 makes clear the steps a party should take if it cannot produce evidence to support or defend a motion for summary judgment:

be seen promptly." (Stroupe Decl.) Tasks—like LPN Stroupe's—showed up in Hairston's EMR when PA Hovis logged on to her computer. (Hovis Dep. 77:11–19.) Hairston subsequently received an x-ray.

On May 1, Dr. Justin Pham, an outside radiologist, read Hairston's films and concluded that there was "no acute fracture or dislocation" and that "[t]he soft tissues are unremarkable." (May 1, 2017 Radiology Interpretation Report [ECF No. 133-11].) PA Hovis initialed Dr. Pham's Radiology Interpretation Report the same day, acknowledging Medical's receipt of it. (*Id.*; Hovis Dep. 65:18–22.) She entered a Chart Note in Hairston's EMR that the x-ray was within normal limits. (Chart Note at 2:59 p.m., May 1, 2017.) She also relayed Dr. Pham's conclusions to Hairston on May 1, informing him that his x-rays were "normal." (May 1 Medical Note to Hairston [ECF No. 133-12]; Hairston Dep. 41:3–8; Hovis Dep. 65:18–66:23.) PA Hovis entered in Hairston's EMR that Stroupe's April 30 Task had been completed: "completed Appointment – reviewed nurses note, x-ray ordered." (Task List at 8:33 a.m., May 1, 2017.) Although PA Hovis considered an inmate who had "pain and swelling [and] an inability to ambulate correctly" a "serious medical need" (Hovis Dep. 49:10–18), she made no

---

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1)      defer considering the motion or deny it;
    (2)      allow time to obtain affidavits or declarations or to take discovery;
    (3)      issue any other appropriate order.

Fed. R. Civ. P. 56(d). Hairston did not comply with Rule 56(d). Although Hairston may raise the issue of this alleged spoliation at or before trial, therefore, the court takes no position at this point on its merit or potential effect. The court will review only the record before it on this motion to determine whether there is a genuine dispute of material fact, without regard to Hairston's late-breaking allegation of misconduct.

effort at that time to examine Hairston to determine what was causing his pain, swelling, and ambulatory issues.

Hairston "continued complaining about [his] ankle" after receiving PA Hovis's note that his x-ray was "normal." (Hairston Dep. 41:15–23.) He complained to "[t]he deputy, the medical staff, people that bring the cart around, and anybody that [he] would encounter in terms of staff." (*Id.* 41:24–42:2.) Deputy Belanger recalled having several conversations with Hairston about his ankle, but not exactly when they occurred. (Belanger Dep. 33:3–36:7.) As a result of these conversations, Belanger called Medical "a few times" for Hairston. (*Id.* 37:8–15.) Although he usually made phone calls to Medical about Hairston's complaints, on one occasion he actually went to Medical in person to report Hairston's complaints. (*Id.* 54:3–23.) When he went in person, someone from Medical told him that they were "working on a doctor's appointment or something for [Hairston] or a—to see—or schedule either the doctor or a physician assistant to see him in the jail." (*Id.* 54:13–19.) Belanger is certain that he contacted Medical each time Hairston complained to him and that "[t]hey advised [him] different each time what was being done." (*Id.* 60:4–18.) At least one of Hairston's complaints to Deputy Belanger was after the May 1 x-ray result (and was probably on May 15 or 16) because Belanger testified that, based on one of these conversations with Medical, he knew that Hairston had already been seen by Medical, that x-rays had been done, and that he was scheduled to be seen again. (*Id.* 60:20–61:23, 77:20–78:4.)

On May 15, Hairston completed another Medical Request Form, which read, "I have continually informed medical personel [*sic*] that the problem (serious) with my leg continues to get worse and no one has called me to be seen . . . ." (May 15 Medical Request Form [ECF

No. 133-14]; Hairston Dep. 43:3–44:17, 157:2–9.) At that time, PA Hovis went into Hairston's EMR and read LPN Stroupe's April 30 Chart Note and LPN Norman's May 4 Chart Note. (Hovis Dep. 69:11–24.) She scheduled Hairston for the next available sick call day. (May 15 Medical Request Form; Hovis Dep. 70:12–15.) She also responded to Hairston that same day, telling him that he had been seen on April 30 and May 4, his x-ray was normal, and that she had scheduled him to see a doctor.

On May 16, Hairston complained to Belanger about his ankle injury, "that he had hurt his foot three weeks earlier," that he was not satisfied with his treatment, and that he "thought he had a torn Achilles based on something [he] received in the mail from WebMD." (Belanger Dep. 97:14–98:3.) Hairston asked Deputy Belanger to speak to a supervisor regarding his injury. (Id. 98:4–16.) Deputy Belanger contacted Medical, who said that they were aware of Hairston's issue, had seen him a couple of times, and that his x-rays were negative.

Deputy Belanger relayed Hairston's request and Medical's response to Sgt. Earls. (Belanger Dep. 107:5–109:17.) Before going to see Hairston, Sgt. Earls consulted Medical, and LPN Delilah Browley told him that Hairston was on the list to see a Provider the next day, that Medical had already seen him, and that his x-rays were negative. In Sgt. Earls's view, "it was not portrayed [ ] as an emergent situation." (Earls Dep. 110:7–21, 112:19–113:4.)

When Sgt. Earls arrived to see him, Hairston told Sgt. Earls that his Achilles tendon was ruptured, pointing to the WebMD.com print-out about Achilles tendon injuries that his partner had mailed to him. (Hairston Dep. 47:18–50:1; Earls Dep. 112:11–18, 113:13–114:19.) Earls responded, "I don't doubt you have a problem[,] but what is it you would like me to do for you[?]" (Earls Dep. 115:6–116:5.) Sgt. Earls further explained to Hairston that he was

- 12 -

scheduled to see Medical the next day. (Hairston Dep. 54:21–25; Earls Dep. 117:12–20, 119:4–10.) At that point, the conversation between Sgt. Earls and Hairston "turned into a real mess." (Hairston Dep. 49:23, 113:23.) Sgt. Earls testified that Hairston raised his voice and said to Sgt. Earls, "you're going to fucking listen to me, I've listened to you enough." (Earls Dep. 120:20–121:10.) Belanger corroborated Sgt. Earls's recollection, testifying that Hairston became disorderly and was cursing at Sgt. Earls. (Belanger Dep. 100:15–21, 105:7–13.) Sgt. Earls testified that other inmates were watching his interaction with Hairston, and that Hairston's conduct was causing a security issue. (Earls Dep. 141:11–19, 158:23–25.) Hairston denies cursing or becoming belligerent and maintains that it was Sgt. Earls, not Hairston, who was yelling during their conversation. (Hairston Dep. 113:17–114:2.)

Sgt. Earls perceived that he was losing control of the situation, which posed a security risk, so he instructed Hairston to "roll up" his belongings. (*Id.* 162:2–163:13.) According to Sgt. Earls, he transferred Hairston to a single unit, segregated cell ("Restrictive Housing") to "control safety and security in the facility," and so Hairston "ha[d] no chance to further injure himself." (*Id.* 121:18–122:2.)

Hairston was standing and walking, albeit with a limp, during the incident with Sgt. Earls, and subsequently walked a considerable distance from his pod to Restrictive Housing. (Belanger Dep. 114:9, 119:6–7; Murphy Dep. 92:11–16; Hairston Dep. 53:22–25; Earls Dep. 118:3–4, 142:13–143:3, 156:11–15.) Hairston, who was carrying his belongings during this transfer, claims that he verbally protested that he could not walk. (Hairston Dep. 53:17–54:17.) In the meantime, Sgt. Earls contacted Nurse Browley about Hairston's Restrictive Housing placement, and she approved it. (Chart Note at 10:49 p.m., May 16, 2017.) This May 16

incident was Sgt. Earls's only interaction with Hairston. (Hairston Dep. 114:3–6; Earls Dep. 147:2–9.)

On May 17, PA Hovis finally saw Hairston in Medical. (Hairston Dep. 56:2–24; May 17 Duty Post Log [ECF No. 133-18].) This was the first time that Hairston was seen by a Provider for the Achilles tendon injury he sustained on April 24. When PA Hovis examined Hairston, she performed a Thompson test[22] on Hairston and diagnosed him as having a right Achilles tendon injury. (Hovis Dep. 84:17–89:7.) Based on her examination, PA Hovis determined that Hairston's condition was not emergent—that Hairston did not have "any urgent issues that could jeopardize life or limb"—but that it was appropriate to schedule Hairston for the soonest available orthopedics appointment. (*Id.* 72:20–73:5, 92:19–23.) PA Hovis referred Hairston for an orthopedic-specialist consultation at the soonest available appointment, ordered Hairston to wear a knee-high boot and remain 100% non-weight bearing, and prescribed the pain reliever Naproxen. (*Id.* 91:20–94:10; Task List at 10:45 a.m., May 17, 2017; Hairston Dep. 57:2–58:3.) Judy Binkley, a CCS medical scheduler, scheduled Hairston's orthopedics consultation for May 24. (Hovis Dep. 71:8–73:5.) On or about May 19, CMA Burdette delivered a medical boot to Hairston for his right ankle. (Hairston Admis. 17 to Med. Defs.' Req. for Admis. ¶ 17; Burdette Dep. 59:4–13; Murphy Dep. 87:10–19.)

Hairston was transferred out of Restrictive Housing to a medical pod—Medical Unit 1F—on May 22. (Hairston Dep. 118:6–23.) Hairston claims that, when he was moved to pod

---

[22] A Thompson test is "a specialized test in which you squeeze the calf muscle and you're looking for plantar flexion of the foot, which means forward projection of the foot pushing down to the ground. In the absence of being able to do that function, then you have to assume that there is an injury, a tear or trauma to the Achilles tendon." (Hovis Dep. 84:17–85:1.)

1F, he was not assigned a bottom bunk or a floor bed and that a deputy (whom Hairston could not identify by name) told him to go to a top bunk. (*Id.* 118:18–119:25.) Because Hairston could not climb up to the top bunk due to his injury, he slept in either a chair or his fellow inmate's bottom bunk. (*Id.* 120:1–121:25; Boyd Decl. ¶¶ 10–17.) Jail records indicate that Lt. Perkins—the Classifications Deputy—assigned Harrison to a floor bed[23] in Medical Unit 1F, which was an emergency assignment temporarily until a bottom bunk became available. (Perkins Dep. 68:3–11, 71:12–23, 105:21–23, 120:17–18; Classification Record Supplement [ECF No. 133-46].)

On May 24, Hairston saw orthopedic surgeon James Chandler, M.D., at Carilion Clinic's Orthopedics Department. (Hairston Dep. 60:17–25.) Dr. Chandler diagnosed Hairston with a "[c]hronic right Achilles rupture" (Carilion Medical Report [ECF No. 139-16]) and wrote on the consult sheet, "surgery – time not critical," and prescribed the pain medication Lovenox to start "the day after surgery." (May 24, 2017 Consult Sheet [ECF No. 133-22].) Dr. Chandler's note indicated that "nonoperative treatment at this point would not be successful, because the gap has scarred in, and after 4 weeks being able to get into and repair without proximal lengthening and or tendon transfer would also be highly unlikely." (Carilion Medical Report p. 6 [*sic* throughout].) Hairston elected to defer his surgery until his scheduled release from jail in September of 2017. (Chart Note at 3:50 p.m., May 28, 2017; Chart Note at 11:29 a.m., June 1, 2017.) Apparently, Dr. Chandler told Hairston that he "might

---

[23] A floor bed is "just a mattress on the floor," without a frame like a bed. (Perkins Dep. 75:5–11.)

as well wait [until] September" since the damage would not get any worse by waiting. (Hairston Dep. 61:10–62:12.)

The same day as his appointment with Dr. Chandler, Hairston was moved from Medical Unit 1F to Medical Unit 2L. Hairston has offered conflicting testimony on whether he received a bottom bunk at that time. (*Compare* Hairston Dep. 63:19–64:23, *with* Hairston Dep. 121:9–11.) According to both Jail records and Lt. Perkins, Hairston was assigned a bottom bunk that had become available in Medical Unit 2L. (Perkins Interrog. 2 Answer; Perkins Dep. 73:16–74:2, 78:25, 79:1–2, 120:17–20; Classification Record Supplement.)

On September 5, 2017, Hairston was released from the Jail. (Hairston Dep. 67:17–20.) He underwent surgery on his right Achilles tendon on or about September 21, 2017. (*Id.* 68:7–11.) Hairston could not put weight on his ankle for months, went through a long and hard rehabilitation process, and still suffers from pain from his injury. (*Id.* 69:18–72:21.)

Hairston filed his complaint in this court on April 23, 2019. (*See* ECF No. 1.) On August 7, 2019, the Sheriff Defendants moved to dismiss the claims against them—Counts I through IV. (*See* ECF No. 12.) After the court granted the motion to dismiss in part (*see* ECF Nos. 44 & 45), Hairston's remaining claims are as follows, numbered according to their position in the complaint (*see* ECF No. 1):

III.    42 U.S.C. § 1983 against Sheriff Allen – Supervisory Liability

IV.    42 U.S.C. § 1983 against the Deputy Defendants – Deliberate Indifference to Serious Medical Needs ("DISMN")

V.    42 U.S.C. § 1983 against the CCS Defendants[24] – DISMN

---

[24] The Complaint refers to the CCS Defendants as all of the medical personnel, who are composed of the Medical Defendants, Jane/John Does, M.D.: *CCS's Licensed Physician and Medical Director at Roanoke City Jail from*

VI.     42 U.S.C. § 1983 against CCS – Policy or Custom of DISMN

VII.    Negligence against the CCS Defendants

VIII.   Third Party Beneficiary Breach of Contract against the CCS
        Defendants

The Medical Defendants and the Sheriff Defendants have each moved for summary

judgment on Hairston's claims. The motions were fully briefed by the parties, and the court

heard oral argument on September 8, 2022, making the motions ripe for disposition. For the

following reasons, the motions will be granted in part and denied in part.

## II.     STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine

if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va.*

*v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d

323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under

the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248–49). But if the evidence of a genuine

issue of material fact "is merely colorable or is not significantly probative, summary judgment

may be granted." *Id.* at 249–50 (cleaned up).

In considering a motion for summary judgment under Rule 56, a court must view the

record as a whole and draw all reasonable inferences in the light most favorable to the

---

*April 24, 2017 to May 24,2017 (sic)*, Jane/John Does: *Medical Administration Personnel and Sick Call Triage Nurses on duty at Roanoke City Jail from April 24, 20147 (sic) to May 24, 2017*, and Justin Pham, M.D.

nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson*, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the nonmoving party's case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (cleaned up). The evidence relied on must proffer "sufficient proof, in the form of admissible evidence, that could carry the burden of proof" at trial. *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).

## III.   ANALYSIS

### A.   Hairston's 42 U.S.C. § 1983 Claims (Counts III, IV, V, and VI)

#### 1.   Standard of Law for 42 U.S.C. § 1983 Claims for DISMN in Violation of the 8th Amendment

To state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege facts indicating that he has been deprived of a right guaranteed by the Constitution or laws of the United States, and that this deprivation resulted from the conduct of a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S.

137, 144 n.3 (1979)). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.*

To establish a cognizable Eighth Amendment claim for denial of medical care, a plaintiff must put forth facts sufficient to demonstrate that an official was deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Conner v. Donnelly*, 42 F.3d 220, 225 (4th Cir. 1994); *Staples v. Va. Dep't of Corr.*, 904 F. Supp. 487, 492 (E.D. Va. 1995). A DISMN claim has two distinct components. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Deliberate indifference "describes a state of mind more blameworthy than negligence," but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. One has been deliberately indifferent if he or she acted recklessly by "consciously disregard[ing] a substantial risk of serious harm." *Id.* at 839 (cleaned up). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson*, 775 F.3d at 178 (quoting *Farmer*, 511 U.S. at 837). This is an "exacting standard," which requires more than "mere negligence or even civil recklessness." *Id.* (citing *Estelle*, 429 U.S. at 106).

To rise to the level of deliberate indifference, "it is not enough that an official *should* have known of a risk" to an inmate's health. *Id.* Rather, the official "must have had actual

subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* "The *Farmer* test requires plaintiffs to demonstrate officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). To constitute deliberate indifference, the treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837. "The subjective component therefore sets a particularly high bar to recovery." *Iko*, 535 F.3d at 241.

### 2.  The "Objective Prong" of the DISMN Analysis

In determining whether any of the defendants was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, Hairston must first show that he objectively had a serious medical need.

Dr. Chandler diagnosed Hairston with a ruptured right Achilles tendon on May 24, 2017, a month after Hairston injured it. According to the Mayo Clinic, "The Achilles tendon is a strong fibrous cord that connects the muscles in the back of your calf to your heel bone." Mayo Clinic Staff, *Achilles tendon rupture*, Mayo Clinic (Oct. 19, 2022, 12:30 PM, https://www.mayoclinic.org/diseases-conditions/achilles-tendon-rupture/symptoms-causes/syc-20353234. Its rupture is often accompanied by "sharp pain in the back of [the] ankle and lower leg that is likely to affect [the] ability to walk properly. Surgery is often performed to repair the

rupture[,]" although nonsurgical treatment works in some cases. *Id.* Hairston's ruptured Achilles tendon was so severe that it would not "get better on [its] own without seeing a [P]rovider" (Dep. of Stephen Crossland, M.D. 33:4–22, Mar. 8, 2022 [ECF No. 133-51]) and instead required surgery to repair (*see* May 24, 2017 Consult Sheet). Given the nature of the injury, the pain that typically results from it, and the severity of Hairston's particular rupture, the court joins the numerous others that have concluded that an Achilles tendon rupture is a serious medical need. *See Bradford v. Owens*, No. 3:11-cv-00488, 2016 U.S. Dist. LEXIS 164200, at *24 (W.D. Ky. Nov. 29, 2016) ("Courts have generally agreed that a ruptured Achilles tendon is a serious medical need.") (collecting cases); *see also Navarro v. Wexford Health Sources*, No. 3:18-cv-00143, 2018 U.S. Dist. LEXIS 24253, at *13 (S.D. Ill. Feb. 14, 2018*)* ("The Court finds that Plaintiff's ruptured Achilles tendon constitutes a serious medical need so as to satisfy the objective standard.").

Having found in Hairston's favor on the "objective prong," the court analyzes Hairston's DISMN counts under the "subjective prong."

### 3. Hairston's 42 U.S.C. § 1983 Claim Against the Medical Defendants for DISMN (Count V)

Hairston alleges in Count V that the Medical Defendants failed to provide adequate medical treatment for his Achilles injury because, despite being aware of his ruptured Achilles tendon symptoms, they refused to provide timely and appropriate medical care, thereby causing him permanent disability that could have been avoided or mitigated by prompt treatment.

In the context of inadequate medical care claims, "deliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or

omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. To state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle*, 429 U.S. at 106. "Questions of medical judgment are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). A prisoner's "dissatisfaction with the course of his treatments and the doctors' decisions about which medications may be prescribed does not implicate a constitutional violation." *Conrad v. Akers*, No. 7:10cv560, 2011 WL 3847017, at *9 (W. D. Va. 2011) (citing *Estelle*, 429 U.S. at 104); *see also Martins v. Akers*, No. 7:11-CV-00252, 2012 WL 3133683, at *6 (W.D. Va. July 31, 2012).

The court concludes that a rational juror could find that PA Hovis—but no other Medical Defendant—was deliberately indifferent to Hairston's serious medical needs. The court will therefore grant the Medical Defendants' motion for summary judgment except as to PA Hovis.

### a. **PA Amy Hovis**

By May 1, PA Hovis knew from the EMR Task List and Chart Note entries that Hairston had complained to Medical and that LPN Stroupe had ordered an x-ray of his right ankle.[25]   Radiologist Justin Pham, M.D., read Hairston's films, concluded that there were "no acute fracture or dislocation" and that "[t]he soft tissues are unremarkable[,]" and submitted

---

[25] The x-ray Task entry was made under PA Hovis's name but the evidence appears to show that LPN Stroupe entered it. (Task List at 8:33 a.m., May 1, 2017.)

his report to that effect in the afternoon on May 1. (Justin Pham, M.D., May 1, 2017 Radiology Interpretation Report.) That same day, PA Hovis initialed Dr. Pham's Radiology Interpretation Report, acknowledging her receipt of it, and sent a Medical Request Form note back to Hairston informing him that his x-ray was normal. From May 1 until May 17, PA Hovis made no effort to follow up to see if Hairston's complaints were attributable to a bona fide injury (as they, in fact, were).

A reasonable jury could conclude that, on May 1, PA Hovis knew that Hairston had complained of a swollen, painful right ankle and leg after falling off his bunk and that LPN Stroupe had observed him limping. She also knew that LPN Stroupe had determined Hairston's medical need was serious enough to warrant pain medication, a brace and ACE bandage,[26] and an x-ray. (Chart Note at 12:06 a.m., April 30, 2017.) Further, she was aware that Hairston's x-ray had come back negative for fractures, suggesting that his reported injury and continuing pain had some other cause. Despite all of this, PA Hovis did nothing else to diagnose or treat this injury until she saw Hairston 17 days later. PA Hovis did not take any steps to find out why Stroupe had ordered Hairston an x-ray. (Hovis Dep. 67:11–21.) She did not order a nurse or ask a deputy to bring Hairston to Medical to be seen by her or another Provider. Despite being the Monday through Thursday Provider, PA Hovis did not review Hairston's Chart Notes again (or perhaps at all) until she received his May 15 Medical Request Form. Only then did she schedule him for a medical appointment on May 17. (Hovis Dep. 60:22–61:14, 97:18–22.) Instead, she indicated that she had "[c]ompleted [the] [a]ppointment,"

---

[26] Whether Hairston refused the brace or ACE bandage is immaterial to the facts that LPN Stroupe thought his condition was serious enough to indicate it and that her Chart Note indicated her thinking.

indicated by LPN Stroupe's April 30 Chart Note, because she had "reviewed nurses note, x-ray ordered." (*See* Task List at 8:33 a.m., May 1, 2017; Chart Note at 12:06 a.m., April 30, 2017.) In the interim, Hairston *correctly* self-diagnosed his Achilles tendon rupture from a WebMD printout.

"'Failure to provide the level of care that a treating physician h[er]self believes is necessary' may constitute deliberate indifference." *Jackson*, 775 F.3d at 179 (quoting *Miltier*, 896 F.2d at 853). PA Hovis testified that if an inmate had pain and swelling and an inability to ambulate correctly, she would consider that to be a serious medical need. (Hovis Dep. 49:10–18.) And yet, these were the very symptoms indicated in Hairston's EMR Task List and Chart Notes. PA Hovis testified that she had also seen approximately 10–12 Achilles tendon tears or ruptures in her 16 years practicing medicine, so she knew how serious that type of injury was and had seen the symptoms indicative of it before. (*See id.* 14:25–15:4.) Indeed, when PA Hovis examined Hairston on May 17, she knew to perform a Thompson test, which was positive, and diagnosed him as having a right Achilles tendon injury. (*Id.* 84:17–89:7.) She also testified that the x-ray and positive Thompson test would not reveal the full extent of the tear, and that only advanced imaging—like a CT scan or MRI—would capture it. (*Id.* 89:1–10.)

Based on this evidence and valid inferences therefrom, a reasonable jury could conclude that PA Hovis acted recklessly and "consciously disregarded a substantial risk of serious harm" to Hairston. PA Hovis did not promptly see Hairston or take further action to address his symptoms, even when faced with an x-ray that provided no clarity as to the cause of his symptoms that she later conceded were indicative of a ruptured Achilles tendon. *See Farmer*, 511 U.S. at 835–39. In other words, a reasonable jury could find that PA Hovis was

"aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that she drew the inference. *Id.* at 837.

A rational jury could also find that PA Hovis delayed Hairston's treatment by not examining him anytime between May 1 and May 17, thereby exacerbating his injury and prolonging his pain. "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Abraham v. McDonald*, 493 F. App'x 465, 466 (4th Cir. 2012) (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)); *see also Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015). There is a genuine issue of material fact as to whether 17-day delay in treatment exacerbated Hairston's injury. Dr. Chandler's note indicated that "nonoperative treatment at this point would not be successful, because the gap has scarred in, and after 4 weeks being able to get into and repair without proximal lengthening and or tendon transfer would also be highly unlikely." (Carilion Medical Report at 5 [*sic* throughout].) And even if the damage noted by Dr. Chandler was not sufficient, Hairston's testimony regarding his continuing pain would be. *See Abraham*, 493 F. App'x. at 466–67.

For these reasons, PA Hovis is not entitled to summary judgment, and a jury will determine whether she was deliberately indifferent to Hairston's serious medical need.

### b. **The CMAs**

Jail records show that each of the six CMA Defendants—Ligia Trigo, Shanita Byers, Racheal Boon, Deanna Bernard, Bridget Randolph, and Victoria Burdette—distributed medication to Hairston at least once between April 24, 2017 and May 24, 2017. Hairston makes the sweeping claim that he complained about pain and his swollen ankle to "each and every

nurse . . . [a]ll of them, every last one of them, every day," but he does not recall whether it was in April or May. (Hairston Dep. 98:8–20.)

The CMAs are not trained to diagnose medical conditions and were not permitted to conduct physical assessments of inmates. (Randolph Dep. 54:5–10; Burdette Dep. 30:18–23.) Of the six CMAs, only Burdette recalled with any specificity Hairston complaining about his ankle. (Burdette Dep. 35:22–39:8, 44:3–49:14.) The others either do not remember Hairston at all, do not remember him with any specificity, or do not remember him complaining about his ankle. (Bernard Dep. 86:18–88:17, 95:12–97:22; CMA Legia Trigo Dep. 21:21–24, 26:5–21, 28:10–30:17, March 23, 2022 [ECF Nos. 133-39, 81-2]; Byers Dep. 51:8–54:23; CMA Racheal Boon Dep. 40:14–42:5, 45:3–46:13, April 1, 2022 [ECF No. 81-4]; Randolph Dep. 56:13–17, 64:21–66:23.) For his part, Hairston testified that he would not recognize the CMAs if he saw them on the street; he might, however, be able to recognize them if he saw them in uniform. (Hairston Dep. 20:2–21:2, 75:7–20.)

At the hearing on this motion, Hairston correctly conceded that the CMAs are held to the lay-person standard for purposes of analyzing his DISMN claim against them, so the subjective prong question relating to the subjective *actual knowledge* requirement, *Jackson*, 775 F.3d at 178, is whether Hairston's serious medical need "had either been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would have easily recognized the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225 (cleaned up) (quoting *Iko*, 535 F.3d at 241). Under this high standard, the CMAs are entitled to summary judgment.

i.  <u>CMAs Ligia Trigo, Shanita Byers, Racheal Boon, Bridget Randolph,
and Deanna Bernard</u>

Jail records reflect that CMA Trigo distributed medicine to Hairston approximately 7 times between April 24 and May 24; Byers 3 times; Boon 6 times; Randolph 7 times; and Bernard 14 times. Trigo remembers administering medication to Hairston and seeing him in a medical boot, but she does not remember conversing with him, Hairston ever telling her that he was injured, or Hairston requesting a Medical Request Form from her. (Trigo Dep. 26:5–21.) Byers does not recall Hairston, does not recall seeing him limp, and does not recall Hairston telling her that he had hurt his ankle. (Byers Dep. 52:16–54:1.) Boon does not recall Hairston. (Boon Dep. 16:4–11, 41:11–17, 45:3–14, 56:14-23.) Randolph does not remember Hairston or any inmate with an Achilles tendon injury. (Randolph Dep. 56:13–17.) Bernard does not recall any conversation she may have had with Hairston and does not recall Hairston complaining about his ankle, limping, showing his foot to her, or needing to see a doctor in April or May 2017. (Bernard Dep. 86:18–88:17, 95:12–97:22.)

Hairston does not recount any specific interaction with any of these CMAs, except for Bernard. On April 24—the day of his injury—Hairston alleges that he "showed his leg to Defendant Bernard, and told her something's wrong, something popped. It's flapping, it's swollen, and it's serious. I need to see the doctor immediately." (Hairston Dep. 74:10–19.) Jail records reflect that CMA Bernard distributed Hairston's medication at 8:00 a.m. on April 24, the only time Hairston received medication that day. But Hairston does not recall interacting with CMA Bernard on that day and he did not request a Medical Request Form on that day. (Hairston Dep. 33:1–14, 74:10–79:12.) And on the next days Bernard was on duty—April 29

- 27 -

and 30—Hairston's Medical Request Form was processed and LPN Stroupe saw him in Medical.

From May 1, until he was examined by PA Hovis on May 17, Hairston was on Medical's radar. And Medical's failure to have a Provider assess him sooner is not to the fault of any of the CMAs since it is undisputed that they did not have the authority to place him on the sick call list (let alone provide medical care). With Hairston's injury not yet diagnosed by a Provider and being one commonly misdiagnosed as a sprain, a reasonable jury could not conclude that the CMAs actually knew of and disregarded a serious medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225 (quoting *Iko*, 535 F.3d at 241).

Hairston's sweeping assertion that he notified "every nurse, every day," and cellmate Boyd's eleventh-hour assertion[27] that he saw Hairston hand in what he recognized to be Medical Request Forms "to the medication aide nearly every day," without any specific testimony about interactions with these CMAs, is insufficient to survive summary judgment. "In order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). Even if Hairston interacted with CMA Bernard on April 24, he did not request a Medical Request Form from her, which he knew how to do and knew generally resulted in a response

---

[27] Clarence Boyd came forward and swore to his Declaration on August 17, 2022, and Hairston submitted it on August 22, 2022—a month after discovery closed on July 22, 2022 (*see* Revised Scheduling Order [ECF No. 123]) and over four months after the instant motions were filed on April 11, 2022 (*see* ECF Nos. 76 & 80).

from Medical "a day later." (Hairston Dep. 158:3–17.) And he does not identify with requisite specificity which of these CMAs he complained to about his injury, when he complained, or when (and to whom) he handed the additional Medical Request Forms. This is a basic failure of proof, and federal law does not countenance his broad, sweeping assertions as a basis to hold the CMAs collectively accountable. *See Wright v. Bragg*, No. 8:17-cv-02805-DDC-JDA, 2019 WL 3308410 at *5-6 & n.7 (D.S.C. February 6, 2019) (R&R), *adopted by* No. 8:17-cv-02805-DCC, 2019 WL 2521331 (D.S.C. June 19, 2019) (dismissing a DISMN claim for failure to state a claim against defendants where plaintiff failed to allege that he or anyone else communicated his complaints to the defendants, holding that "there is no basis for attributing to the other [d]efendants any knowledge of [p]laintiff's complaints of inadequate treatment."); *see also Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.").

Even if the court presumed that some or all of the CMAs *did* hear or overhear Hairston's complaints during their medication rounds, there is still no evidence that they understood his complaints to constitute a serious medical need *or* that they disregarded them. Unlike PA Hovis, there is no evidence that the CMAs would have been aware of anything more than Hairston's repeated complaints. There is no evidence that they knew of LPN Stroupe's analysis, the x-ray results, or any other indication that Hairston's complaint was for more than a painful ankle. Based on these undisputed facts, no reasonable jury could find that CMAs Trigo, Byers, Boon, Randolph, or Bernard knew of and were deliberately indifferent to Hairston's serious medical needs under the high constitutional standard.

ii.  <u>CMA Victoria Burdette</u>

Jail records reflect that CMA Burdette distributed medicine to Hairston approximately 12 times between April 24 and May 24, including April 25–29 and May 4. Burdette recalls Hairston telling her that he had injured his ankle by jumping off his bunk and recalls Hairston looking normal but wincing a little, appearing to be in pain, and having a slight limp when he walked. She testified that she handed Hairston a Medical Request Form and relayed the information to the charge nurse. (Burdette Dep. 35:22–39:8.) Burdette does not recall exactly when this was or which charge nurse she spoke to in Medical. (*Id.* 45:4–50:9.)

Hairston complained to CMA Burdette at least a second time about his ankle, and he complained to her on consecutive days. (*Id.* 45:20–47:21.) The evidence establishes that CMA Burdette verbally relayed Hairston's complaints to the charge nurse at least once. (*Id.* 47:7–48:5.) RN Norman's May 4 Chart Note corroborates Burdette's testimony that Hairston was complaining to her, and that she was passing these complaints on to the nurses.[28]

CMA Burdette did not have the authority to place an inmate on the sick call list; the nurses handled that. (*Id.* 17:15–25.) Any delay in scheduling or treating Hairston is thus not attributable to CMA Burdette, who is not a trained medical provider.

Moreover, Hairston described his interactions with CMA Burdette in a way that warrants granting her summary judgment:

> Q: Okay. Do you remember having any specific interaction with
> Victoria Burdette?

---

[28] CMAs Burdette and Byers were the only CMAs to distribute medication to Hairston on May 4, 2017. (*See* Medication Delivery Chart, May 4, 2017; Chart Note at 10:53 a.m., May 4, 2017.)

> A: Yes, ma'am. She was the person that helped me. If I had to characterize anybody in this jail that helped me, she was the one.
>
> Q: Okay. Well, tell me what you mean by that.
>
> A: . . . Ms. Burdette, Nurse Vicky I called here, she was sincere. She did everything she could to help me . . . .

(Hairston Dep. 85:20–86:4.) Because CMA Burdette was not indifferent to Hairston's serious medical condition, her motion for summary judgment will be granted.

In sum, the court will grant summary judgment to the Medical Defendants on Count V except as to PA Hovis. Hairston's claim against PA Hovis will proceed to trial.

### 4. Hairston's 42 U.S.C. § 1983 Claim Against CCS for a Policy or Custom of DISMN (Count VI)

Hairston alleges in Count VI that CCS maintained a policy or custom of deliberate indifference to inmates' serious medical needs, including his own. (Compl. ¶ 110.)

Although § 1983 is normally utilized to vindicate constitutional violations committed by individual state actors, under *Monell v. Department of Social Services*, a § 1983 lawsuit is authorized against certain governmental entities where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). Under § 1983's "color of law" requirement, a proper defendant in a § 1983 action "must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that the non-state actor is engaged in the state's actions." *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir. 1999). "[T]here is no bright-line rule separating state action from private action," and "the inquiry is highly fact-specific in nature." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 116 (4th Cir. 2022).

Here, CCS contracted with the City of Roanoke to provide inmate medical services at the Jail. Although contracting with the government does not, on its own, make a private entity a state actor, a private entity is considered a state actor "when the government has outsourced one of its constitutional obligations to [that] private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1929 n.1 (2019); *see also West*, 487 U.S. at 56 (holding that a state's delegation by contract of its duty to provide medical care to prisoners rendered a contract physician a state actor). And this Circuit has held that the *Monell* standard, not *respondeat superior*, applies to private corporations for § 1983 purposes. *See Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727 (4th Cir. 1999). *See also Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 790 n.2 (7th Cir. 2014) ("All other circuits that have addressed the issue have reached the same conclusion, extending the *Monell* standard to private corporations" (collecting cases from the First, Second, Third, Sixth, Ninth, Tenth, and Eleventh Circuits)); *Buckner v. Toro*, 116 F.3d 450, 452–53 (11th Cir. 1997) (holding that *Monell*'s policy or custom requirement applied to a private company that contracted to provide medical care to jail inmates). Because the state is constitutionally obligated to provide medical care to prison inmates, and because it delegated that obligation by contract to CCS, CCS is a state actor for § 1983 purposes.

But CCS is only liable under section 1983 if it caused a constitutional deprivation through an official policy or custom. *Monell*, 436 U.S. at 690–91. A plaintiff can demonstrate a policy or custom "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with policymaking authority; (3) through an omission, such as a failure to properly train officers that manifests a deliberate indifference to the rights

of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

Prevailing under a custom or practice theory "is no easy task." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) "A plaintiff must point to a persistent and widespread practice . . ., the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Id.* (cleaned up) "Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Id.*

Here, CCS's express, written policy is to provide timely and adequate care for inmates (*see* Contract, *passim*), and Hairston has not pointed to any evidence that a person with policymaking authority made any decision violating his constitutional rights, *or* that CCS failed to train any employee leading to a deprivation of his constitutional rights. Instead, Hairston argues that two of CCS's unwritten policies, customs, or practices were "the moving force behind" the alleged violation of his Eighth Amendment right to be free from cruel and unusual punishment: (1) "their policy of having LPNs order diagnostic tests without the supervision of Doctors, PAs[,] or nurse practitioners—in other words, their policy of permitting, or, more accurately, requiring, LPNs to practice medicine without a license[;]" and (2) "its custom of allowing practitioners such as PA Hovis to review diagnostic reports that they did not order and clear a patient without actually having examined the patient." (Pl.'s Br. in Opp. to Med. Defs.' Summ. J. Mot. at 22–23 [ECF No. 139].)

It is true that LPNs routinely order diagnostic tests without Provider supervision. LPN Stroupe ordered an x-ray under PA Hovis's name without consulting her and testified that

> it was common practice at the Jail for RNs and LPNs to order diagnostics on behalf of inmates, including x-rays, without the involvement or approval of a provider (doctor or physician assistant). This practice was encouraged by [CCS] staff and management in the medical unit at the Jail.

(Stroupe Decl.) RN Norman testified that nurses routinely ordered x-rays for inmates when they were concerned that the inmate might have a fracture so the Provider could have the image results prior to a physical examination. (Norman Dep. 74:20–77:3.)

But the problem with Hairston's argument is that there is no evidence that nurses ordering diagnostic tests—even if outside the scope of their licensure—caused harm to Hairston or any other inmate. "[A] policy or custom that is not itself unconstitutional . . . must be independently proven to have caused the violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387–88 (4th Cir. 1987) "A sufficiently close causal link between such a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Spell*, 824 F.2d at 1391. Because there is *no* evidence that this alleged unofficial policy resulted in harm to Hairston (or any other inmate), much less led to a constitutional violation, there is no liability under *Monell*. Indeed, there is no indication that Hairston's injury was sufficiently linked to CCS's practice of allowing nurses to order diagnostic tests. This practice does not make an injury of the type suffered by Hairston "almost bound to happen, sooner or later," as required for *Monell* claims. *Id.* at 1391. Rather, the moving force behind a possible constitutional violation was the failure of a single healthcare provider to examine Hairston for 17 days after his symptoms and negative x-ray result were brought to her attention.

Second, Hairston claims that CCS's "custom of allowing practitioners such as PA Hovis to review diagnostic reports that they did not order and to clear a patient without actually having examined the patient" was responsible for his injuries. There are two problems with this argument. First, unlike the alleged policy of LPNs and other nurses ordering diagnostic testing under Providers' names, there is no evidence that the "policy" Hairston alleges is a CCS "policy" at all; he just claims that it is. But Hairston's formulation of the "policy" is simply a reiteration of his underlying claim. Absent some evidence that there is a "policy" that governed the actions and that led to a violation of Hairston's constitutional rights, his claim fails. *Monell* liability does not attach for "sporadic or isolated" violations of rights, but only for "widespread or flagrant" ones, and Hairston has failed to show that this conduct is widespread and pervasive. *See Owens*, 767 F.3d at 402–03; *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Spell*, 824 F.2d at 1388 ("Neither the existence of such a policy or custom nor the necessary causal connection can be established by proof alone of the single violation charged.").

For these reasons, the court will grant the Medical Defendants' motion for summary judgment on Count VI.

### 5.  Hairston's 42 U.S.C. § 1983 Claim Against the Deputy Defendants for DISMN (Count IV)

In Count IV of his complaint, Hairston alleges that the Deputy Defendants—Deputies Belanger and Murphy, Sergeant Earls, and Lieutenant Perkins—failed to provide adequate

medical treatment for his Achilles tendon injury by (a) delaying his medical treatment, limiting his access to medical care, and refusing to allow him to see a doctor, (b) placing him in segregation, (c) refusing to allow him to have a bottom bunk when he was released from segregation, and (d) refusing to ensure that he received his pain medication as prescribed. (Compl. ¶¶ 84–99.)

As noted above, "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." *Young v. City of Mt. Ranier,* 238 F.3d 567, 575–76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland,* 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officer[ ] *should have* recognized it."). Beyond such knowledge, however, the officer must *also* have "recognized that *his actions were insufficient*" to mitigate the risk of harm to the inmate arising from his medical needs. *Parrish,* 372 F.3d at 303 (emphasis added).

Security personnel in a jail are, to a certain extent, "entitled to rely on the professional judgment and expertise of trained medical personnel." *Estate of Harvey v. Roanoke City Sheriff's Office*, 585 F. Supp. 2d 844, 857 (W.D. Va. 2008) (citing *Miltier*, 896 F.2d at 854). To establish a claim for deliberate indifference against these non-medical jail officials, a plaintiff "must show that the official was personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or was indifferent to the prison doctor's misconduct." *Jamison v. Clarke*, No. 7:18-CV-00504, 2020 WL 5778791, at *11 (W.D. Va. Sept. 28, 2020) (citing *Miltier*, 896 F.2d at 848, *abrogated on other grounds by Farmer*, 511 U.S. 825); *see also Estelle*, 429 U.S. at 104–05; *Martins v. Akers*, No. 7:11-CV-00252, 2012 WL 3133683, at *7

(W.D. Va. July 31, 2012); *Estate of Harvey*, 585 F. Supp. 2d at 857 (granting summary judgment for defendants).

Hairston makes the sweeping, unsupported claim that he complained to deputies "every day, all day." (Hairston Dep. 47:18–20, 77:7–11, 109:23–113:7.) But for an official to be held liable under § 1983, the plaintiff must affirmatively show that the official "acted personally in the deprivation of the plaintiff's rights." *Wright*, 766 F.2d at 850 (cleaned up). Hairston has failed to establish a genuine issue of material fact that any of the named Deputy Defendants was deliberately indifferent to his serious medical needs.

### a. <u>Deputy Belanger</u>

Whomever Hairston complained to "every day, all day," it was not Deputy Belanger, because he was only on duty for five days between April 24 and May 24: (1) April 26; (2) April 27; (3) May 15, (4) May 16; and (5) May 24. Deputy Belanger did not delay Hairston's medical treatment or hinder his access to it on any of these days.[29] To the contrary, Hairston communicated with Medical, or received treatment, on or shortly after each of the days Belanger was on duty. Hairston testified that he submitted a Medical Request Form on April 27 or 28; Medical responded to his request on April 29, and he was seen by LPN Stroupe on April 30. On May 15, Hairston submitted a Medical Request Form about his injury. The same day, Medical responded, PA Hovis reviewed Hairston's Chart Notes, and she examined Hairston two days later. On May 16, Hairston had his encounter with Sgt. Earls and was

---

[29] It is unclear whether Belanger was in fact on duty on April 26. His deposition testimony suggests that he *was* (Belanger Dep. 33:15–34:15), but the parties agree in their briefs that he was *not* (*see* Pl.'s Br. in Opp. to Sheriff Defs.' Summ. J. Mot. Statement of Facts ¶ 11; Sheriff Defs.' Br. in Supp. Summ. J. Mot. ¶ 67). Resolving this fact issue in Hairston's favor for purposes of this motion, *see Anderson*, 477 U.S. at 255, the court assumes that Belanger was on duty April 26, 2017.

ordered to Restrictive Housing. Hairston saw PA Hovis the next morning. And May 24 was the day Hairston saw Dr. Chandler. Further, although Belanger was on duty *at the Jail* on these five days, there is no evidence that Belanger was on duty *in Hairston's pod* on all of them, or that Deputy Belanger and Hairston interacted on those days. Importantly, Hairston did not identify which deputies he complained to on which days, and Jail records do not indicate which deputies made medical rounds with the CMAs.

The court cannot impute receipt of complaints on certain days, let alone *actual knowledge* of the severity of Hairston's injury, to Deputy Belanger solely because he was on duty *somewhere* in the Jail on five days over a three-week period. Moreover, whenever Hairston *did* complain to Deputy Belanger during those five days, it is undisputed that Deputy Belanger contacted Medical on Hairston's behalf. Each time Belanger contacted Medical for Hairston, the staff advised Belanger of what had been or was scheduled to be done for him. In short, the undisputed facts lead to the ineluctable conclusion that Deputy Belanger was *not* indifferent to Hairston's medical condition; to the contrary, he did what he reasonably could to relay Hairston's complaints to the medical professionals.

Although Deputy Belanger "had no reason not to believe" Hairston when he said that he had a torn Achilles tendon, he noted that "he was able to walk, so . . . *I don't know* if it was torn or not." (Belanger Dep. 113:25–114:11 (emphasis added).) There is no evidence that Deputy Belanger *actually knew* how serious Hairston's injury was, or that Hairston's injury was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225 (quoting *Iko*, 535 F.3d at 241). Hairston's injury was not

diagnosed as an Achilles tendon rupture until Dr. Chandler's May 24 examination, so no deputy can be charged with *actually knowing* the extent of Hairston's injury.

Although subjective knowledge of a substantial risk of harm may sometimes "be inferred from the very fact that the risk was obvious, this is not one of those cases." *Moss v. Harwood*, 19 F.4th 614, 625 (4th Cir. 2021) (citing *Scinto*, 841 F.3d at 226 (cleaned up)). Hairston was walking, albeit with a limp. Medical staff at the Jail were aware of Hairston's complaints and symptoms, but even they did not recognize or diagnose the full extent of Hairston's injury until Dr. Chandler examined him on May 24. Neither LPN Stroupe nor RN Norman treated Hairston's injury as emergent when they learned of his condition. Even PA Hovis did not think that Hairston had an emergent medical condition when she examined him on May 17. Hairston's own medical expert, Stephen Crossland, M.D., claims that an Achilles tendon injury "is one of the more missed diagnoses," "misdiagnosed for a sprain . . . or misdiagnosed for another reason." (Crossland Dep. 58:9–11, 60:19–61:4.) And complaints of pain and "that more should have been done by way of diagnosis and treatment" do not by themselves constitute deliberate indifference. *Estelle*, 429 U.S. at 107–08. If *medical providers* cannot always recognize a ruptured Achilles tendon for the serious medical need that it is (*see, e.g.*, Stephen Crossland M.D., Decl., ¶¶ 5, 10–11, Aug. 19, 2022 [ECF No. 139-13]), these deputies cannot be expected to.[30]

---

[30] Plaintiff's proposed corrections expert, Anthony Callisto (proposed at this juncture because the court has not deemed him an expert under Fed. R. Evid. 702 and has not made a determination as to the admissibility of his testimony), opines that the deputies and Sgt. Earls should have recognized Hairston's serious emergency medical condition and brought Hairston into medical for immediate attention, and that they were wrong for not doing that. But he also states that *he* would not be able to differentiate between a sprained ankle or an Achilles injury or whether a limping inmate or an inmate with pain in his foot needed emergent medical attention. It seems to the court that an injury that presents with symptoms like a sprained ankle—a common and not life- or limb-threatening injury—is not one that these deputies can be expected to have deviated from

Ultimately, the court agrees with the Deputy Defendants that they were security personnel "entitled to rely on the professional judgment and expertise of trained medical personnel" regarding Hairston's medical treatment. *Estate of Harvey*, 585 F. Supp. 2d at 857; *see also Boblett v. Angelone*, 957 F. Supp. 808, 813 (W.D. Va. 1997); *Jamison*, 2020 WL 5778791 *11 ("[N]on-medical prison officials are entitled to rely on medical staff to make proper medical judgments . . . ."); *McAfee v. Rockingham Jail*, No. 7:08-CV-00480, 2008 WL 4057352 *2 (W.D. Va. Aug. 29, 2008) (same, and dismissing torn Achilles tendon action); *see also Grady v. Greenfield*, 670 F. App'x 818, 819 (4th Cir. 2016) (holding that "prison officials are entitled to rely on medical opinions," and defendant was "not medical personnel"), *cert. denied*, 138 S. Ct. 187 (2017). The court finds, therefore, that the Deputy Defendants, who are security personnel and have no substantial medical training, "would have no basis to know that plaintiff's limping or swollen ankle resulted from a torn tendon instead of a simple sprained ankle," and no basis to know that "plaintiff's ankle injury involved an Achilles tendon until the orthopedic surgeon evaluated plaintiff." *Martins*, 2012 WL 3133683, at *7.

---

the routine for or, under these facts, have drawn the inference from that Hairston had a serious injury like a ruptured Achilles tendon. The court is not holding that jail security staff can *never* be deliberately indifferent to an inmate's serious needs when the injury is a ruptured Achilles tendon, only that, under these facts, Hairston has not shown a genuine dispute of material fact as to whether these Deputy Defendants actually knew of and disregarded his serious medical condition.

Moreover, the Deputy Defendants had CPR and First Aid training, as required by the Virginia Department of Criminal Justice Services, but no additional medical training. Short of a clear and present medical emergency, like an inmate not breathing, deputies could field medical complaints from inmates and hand them (but not receive back from them) a Medical Request Form or notify medical, but they relied on the medical staff to handle medical issues. That is the medical staff's purpose, hence the City of Roanoke's contract with CCS. There were also HIPAA and policy restrictions on the Deputy Defendants becoming involved with Hairston's medical treatment, other than on a surface level or in the case of a bona fide medical emergency requiring immediate deputy intervention.

Finally, on May 16, Deputies Belanger and Murphy transported Hairston to Restrictive Housing at Sgt. Earls's instruction. In his Complaint, Hairston did not plead any facts about his walking to Restrictive Housing as a basis for his deliberative indifference claim against the Deputy Defendants. "A Plaintiff may not amend his complaint through argument in his brief in opposition to summary judgment." *Williams v. Jackson*, No. C/A 8:07-3661-CMCBHH, 2009 WL 363450 at *7 (D. S.C. Feb. 10, 2009), *aff'd*, 349 F. App'x 867 (4th Cir. 2009). Even if Hairston had alleged that Sgt. Earls's ordering his walking—or deputies Belanger and Murphy carrying out Sgt. Earls's order—constituted a factual basis for his DISMN claim, it would not change the court's analysis. Hairston was standing and walking during the incident with Sgt. Earls, albeit with a limp. (Belanger Dep. 114:9, 119:6–7; Murphy Dep. 92:16; Hairston Dep. 47:18–49:25.) Hairston walked to Restrictive Housing—covering a distance of up to 80–100 yards—while carrying his personal belongings, despite having a ruptured Achilles tendon, limping, and protesting that he could not walk. The fact that Hairston was standing and walking—coupled with the facts that Medical was aware of his complaints (and Belanger knew it), had released him back into the general prison population, and had placed no limitations or restrictions on his physical movements—supports the conclusion that Deputy Belanger did not know that Hairston was suffering from a serious medical condition, nor should he have known.

In sum, based on the undisputed record, a reasonable jury could not conclude that Deputy Belanger was deliberately indifferent to Hairston's serious medical need.

b. **Deputy Murphy**

As with Belanger, whomever Hairston complained to "every day, all day," it was not Deputy Murphy because Murphy was only on duty at the Jail 4 days between April 24 and May 24: (1) May 5–6 overnight shift; (2) May 16; (3) May 19; and (4) May 24. There is also no evidence in the record that Deputy Murphy delayed Hairston's medical treatment or hindered his access to it on any of these days. To the contrary, May 5 was the day after Hairston began receiving Motrin, and Hairston received 200 mg of Motrin three times per day on both May 5 and May 6. (Medication Delivery Chart, May 5, 2017; *see* Chart Notes at 10:53 a.m., May 4, 2017.) May 16 was the day of the incident with Sgt. Earls, and Hairston saw PA Hovis the next day. May 19 was two days after PA Hovis had physically examined Hairston, diagnosed him as having an Achilles tendon injury, prescribed him medication and a boot, and had scheduled him to be seen by Dr. Chandler on May 24. And on May 24, Hairston saw Dr. Chandler. As with Deputy Belanger, there is no evidence that Murphy was on duty in Hairston's pod the four times he worked during the relevant time-period, so the court cannot impute *actual knowledge* of anything to Deputy Murphy on these days. And like Belanger, when Hairston complained to Deputy Murphy, Murphy reported to Hairston that he had let Medical know of Hairston's complaint. (Hairston Dep. 112:2–9.).

Accordingly, no reasonable jury could conclude that Deputy Murphy knew of and disregarded Hairston's serious medical need or that he delayed Hairston's access to medical treatment.

c. **Sergeant Earls**

Sgt. Earls's sole interaction with Hairston was on May 16, 2017, when Deputy Belanger told Sgt. Earls that Hairston had requested to see him. Before going to see him, Sgt. Earls spoke with LPN Delilah Browley and learned that Medical had previously seen Hairston, that his x-rays were negative, and that he was on the list to see a Provider the next day. No one portrayed Hairston's medical situation to Earls as urgent.

Hairston complained to Sgt. Earls about his injury and told Sgt. Earls that he was not satisfied with his treatment. He showed Sgt. Earls a WebMD printout about Achilles tendon injuries and told Sgt. Earls that he thought he had a torn Achilles tendon. But Hairston's self-diagnosis—however correct it turned out to be—is not evidence that Sgt. Earls *actually knew of* and *ignored* Hairston's serious medical need. *See Young,* 238 F.3d at 575–76. Although Sgt. Earls did not doubt that Hairston had a medical issue of some kind, he "didn't believe he [had] a ruptured tendon" and "did not think it was torn due to him being able to walk on it." (Earls Dep. 113:13–25, 115:19–116:5, 117:22–118:8.) Additionally, Sgt. Earls had already contacted medical and confirmed that Hairston was on the list to see a Provider the following day. Based on the evidence in the record, the court cannot say that Sgt. Earls's actions in confirming that Hairston would see a Provider at the next available opportunity amounted to "deliberate indifference" to a serious medical need. To the contrary, the evidence shows that Sgt. Earls took Hairston's complaint seriously and confirmed that the medical providers at the Jail were

aware of it and were planning to see Hairston imminently.[31] For this reason, Sgt. Earls is entitled to summary judgment.

### d.  Lieutenant Perkins

Hairston's only complaint against Lt. Perkins relates to his bed or bunk assignments. Hairston claims—and Clarence Boyd corroborates—that Perkins denied his request for a *bottom bunk* when he was moved from Restrictive Housing to Medical Unit 1F on May 22, 2017. But contemporaneous Jail records show that Perkins assigned Hairston a *floor bed* in 1F.[32] Hairston's and Boyd's assertion that Lt. Perkins told Hairston that there was no bottom bunk available is simply irrelevant. Lt. Perkins does not dispute that a bottom bunk was not available. Rather, Perkins assigned Hairston to a *floor bed* as a temporary emergency assignment until a *bottom bunk* became available. Hairston avers that a deputy—whom Hairston could not identify—told him to go to a top bunk. But Hairston did not use the top bunk; he slept in a chair and then in Boyd's bottom bunk. Hairston was reassigned to Medical Unit 2L and received a bottom bunk there two days later on May 24 when one became available.

There is no evidence that, between April 24 and May 16 (when Hairston was moved to Medical Unit 1F), Hairston slept in anything other than the top bunk, but the record is devoid of evidence that Hairston complained that he needed a bottom bunk during that time. Even if an unidentified deputy countermanded Lt. Perkins's order and denied Hairston his

---

[31] There is no evidence that a Provider was on duty at the Jail on the evening of May 16, so Sgt. Earls could not then have brought Hairston to see a Provider.

[32] A *bottom bunk* is not on the floor but is simply the bottom bunk of a bunk bed, whereas a *floor bed* is just a mattress on the floor. It does not matter whether Hairston or Boyd meant to testify about Hairston being refused a *bottom bunk* or a *floor bed* because the crux of Hairston's claim is that he was given a *top* bunk assignment, as opposed to something he could lie down on without climbing up and down with his injured Achilles tendon.

- 44 -

assigned floor bed, that means that, at worst, Lt. Perkins did not personally confirm that her order had been properly executed by the unidentified deputy.[33] Although sleeping in a chair would no doubt have been uncomfortable, there is no evidence that it exacerbated Hairston's injury or interfered with his medical treatment. Even if what Hairston and Boyd claim is true (and the court assumes that it is true for purposes of summary judgment), it does not rise to the level of DISMN by Lt. Perkins. The court will also grant her summary judgment.

### e.  Allegations of Medication Delays

Insofar as Count IV alleges that the Deputy Defendants refused to ensure that Hairston received his medication as prescribed, Hairston has failed to identify evidence in the record to support his claim. Hairston was prescribed various medications while incarcerated in the Jail— some related to his ruptured Achilles tendon and some not. Hairston's Jail medical records show that Hairston received his prescribed medications between approximately 80 and 100 percent of the time.[34] (*See generally* Medication Delivery Chart.) He received Motrin, Naproxen, Ibuprofen, and Mobic for his complaints of pain. There is no evidence that any of the Deputy Defendants ever prevented the CMAs from dispensing Hairston's medication as prescribed. To the contrary, it is undisputed that one or two deputies always accompanied the CMAs on their medication rounds, facilitating—not hindering—the process.

The only bona fide medication delay was when Hairston did not begin receiving the Motrin 600mg LPN Stroupe had indicated she would order him on April 30. When RN

---

[33] Hairston has not asserted a supervisory liability claim against Lt. Perkins.

[34] It appears that the approximately 80-to-90-percent rate was only not at 100 percent because of a few days when Hairston was absent for some reason.

Norman was notified on May 4 that Hairston was not receiving the medication as prescribed, she put in the necessary order to ensure that Hairston would receive it. This four-day delay in receiving over-the-counter pain medication does not rise to a constitutional violation. The failure to dispense medication as prescribed may have been negligent, but the record is devoid of any evidence to support the inference that the failure was anything more than an oversight.

In sum, considering the undisputed record as a whole, a reasonable jury could not conclude that any of the Deputy Defendants intentionally denied or delayed Hairston's access to medical care or intentionally interfered with his treatment. *See Estelle*, 429 U.S. at 104–05. Hairston's claim therefore fails and the court will grant the Deputy Defendants' motion for summary judgment at to Count IV.

### 6. Hairston's 42 U.S.C. § 1983 Claim against Sheriff Allen for Supervisory Liability for the Deputy Defendants' and Medical Defendants' DISMN (Count III)

Because "there is no doctrine of *respondeat superior* in . . . § 1983 claims, a defendant is liable in his individual capacity only for his personal wrongdoing or supervisory actions that violated constitutional norms." *Fox v. Drew*, No. CIV.A. 8:12-421-MGL, 2013 WL 4776706, at *11 (D.S.C. Sept. 4, 2013) (cleaned up), *aff'd*, 563 F. App'x 279 (4th Cir. 2014). "A court may hold a public official liable for the acts of his subordinates under § 1983 if the plaintiff demonstrates supervisory liability, which is based on a supervisor's indifference or tacit authorization of a subordinate's misconduct." *Pratt-Miller v. Arthur*, 701 F. App'x 191, 193 (4th Cir. 2017) (citing *Shaw*, 13 F.3d at 798) (cleaned up).

In order to establish supervisory liability under § 1983, a plaintiff must show

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive

> and unreasonable risk of constitutional injury to citizens like the
> plaintiff; (2) that the supervisor's response to that knowledge was
> so inadequate as to show deliberate indifference to or tacit
> authorization of the alleged offensive practices[ ]; and (3) that
> there was an affirmative causal link between the supervisor's
> inaction and the particular constitutional injury suffered by the
> plaintiff.

*Pratt-Miller*, 701 F. App'x at 193 (quoting *Shaw*, 13 F.3d at 799 (internal quotation marks omitted)). "'To demonstrate that a risk is pervasive and unreasonable' under the first element 'requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.'" *Id.* at 193 (quoting *Shaw*, 13 F.3d at 799 (internal quotation marks omitted)). "In addition, a 'plaintiff assumes a heavy burden of proof in establishing deliberate indifference,' and must demonstrate a supervisor's continued inaction in the face of documented and widespread abuses." *Id.*

Hairston did not contest the Sheriff Defendants' summary judgment motion against this claim, so he has abandoned it. *See Wainright v. Carolina Motor Club, Inc.*, No. 1:03-CV-01185, 2005 WL 1168463, at *13 (M.D.N.C. April 27, 2005) (finding that a failure to make any argument in support of a claim during summary judgment is "tantamount to abandonment of the claim"). Accordingly, Sheriff Allen is entitled to summary judgment on Hairston's Count III.

## B. Hairston's State Law Claims (Counts VII and VIII)

In Count VII, Hairston alleges negligence against the Medical Defendants based on their failure to treat his Achilles tendon injury timely and properly while he was incarcerated in the Jail. (Compl. ¶¶ 119–124.) In Count VIII, Hairston asserts a breach of contract claim

against the Medical Defendants alleging that CCS breached its Contract for provision of healthcare services at the Jail with the City of Roanoke and that he was an intended beneficiary harmed by the breach. (Compl. ¶¶ 125–131.)

The Medical Defendants argue that Hairston is time barred under the statute of limitations, citing Virginia Code § 8.01-243.2, which places a one-year statute of limitations on claims relating to the conditions of his confinement. (Medical Defs.' Br. in Supp. Summ. J. Mot. at 24–25 [ECF No. 81].) Hairston did not respond to this argument, thereby abandoning each of these claims. *See Wainright*, 2005 WL 1168463 at *13. Moreover, at the September 8, 2022 hearing, Hairston's counsel conceded that these state law claims are time barred. The Medical Defendants will be granted summary judgment on Counts VII and VIII.

## IV.   CONCLUSION

For the reasons stated, the court will grant the Sheriff Defendants' motion, deny the Medical Defendants' motion on Count V as to PA Hovis, and grant the remainder of the Medical Defendants' motion.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 2nd day of November, 2022.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE